UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| D.S. and J.S., individually and on behalf of T.S., <br><br>Plaintiffs, <br><br>v. <br><br>ROCKVILLE CENTRE UNION FREE SCHOOL DISTRICT, <br><br>Defendant. | COMPLAINT <br><br><br>Civil Action No. 19-3430 |

## PRELIMINARY STATEMENT

1. This action is authorized by the Individuals with Disabilities Education Improvement Act of 2004 (the "IDEA"), 20 U.S.C. § 1415(i)(2)(A), Article 89 of the New York State Education Law, N.Y. Educ. Law §§ 4404(3), Section 504 of the Rehabilitation Act ("§504"), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, to review a final administrative decision of the New York State Review Officer ("SRO") regarding the provision of a free appropriate public education ("FAPE") to T.S. ("T" OR "Student"), a student with a disability.

2. D.S. and J.S. ("Plaintiffs" or "Parents"), on behalf of their son, T., seek a reversal of a decision rendered by the SRO on February 13, 2019 (attached hereto as Exhibit A), which sustained in part and reversed in part the November 5, 2018 decision (attached hereto as Exhibit B) of the Impartial Hearing Officer ("IHO").

3. This action is timely commenced within four months of the SRO decision, pursuant to 20 U.S.C. § 1415(i)(2)(B) and New York Education Law § 4404(3)(a).

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. § 1415(i)(2)(A), §504, the ADA, and 28 U.S.C. § 1331, conferring jurisdiction in cases

arising under the Constitution and laws of the United States, and 28 U.S.C. § 1343, conferring original jurisdiction on district courts to secure equitable relief under any Act of Congress providing for the protection of civil rights.

5. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as Rockville Centre School District ("District") has its principal offices in this judicial district.

6. Plaintiffs have exhausted their administrative remedies, by presenting IDEA, Section 504, and ADA claims to the IHO and SRO.

## PARTIES

**Plaintiffs**

7. Plaintiffs reside in Rockville Centre, New York, which is within the geographical boundaries served by the District.

8. T was born on August 26, 2009 and is eight years old as of the time of this filing.

9. The District's Committee on Special Education ("CSE") classified T as IDEA-eligible under the classification "speech or language impairment," according to Individualized Educational Programs ("IEPs") prepared by the CSE.

10. At all relevant times, T was a student with a disability entitled to receive special education and related services. T is also a "qualified individual with a disability," as defined by §504, 34 C.F.R. § 104.3 and the ADA, 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104.

**Defendant**

11. Defendant District is, upon information and belief, a municipal corporation created pursuant to Article 52-A of the New York State Education Law.

12. The District's principal offices are located at 92 Voorhis Avenue, Rockville Centre, New York 11570.

13. The District is a local educational agency as defined by the IDEA, 20 U.S.C. § 1402(19)(A), and responsible under the IDEA and the New York State Education Law for providing a FAPE to residents between the ages of three and twenty-one who have been classified as children with disabilities in need of special education services.

14. The District is a recipient of federal funds subject to §504, 29 U.S.C. § 794(b)(2)(B) and a "public entity" subject to Title II of the ADA, 42 U.S.C. § 12131(1).

## STANDARD OF REVIEW

15. Although federal courts generally defer to state administrative decisions, that deference is not without limitation. Only factual findings that are reasoned and supported by the record merit deference. *L.O. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 109 (2d Cir 2016); *see also A.M. v. New York City Dep't of Educ.*, 845 F.3d 523, 534 (2d Cir. 2017); *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194-1195 (9th Cir. 2017).

## STATUTORY FRAMEWORK

*IDEA*

16. Pursuant to IDEA, in return for federal education funding, states must make available a FAPE to all eligible children. *Endrew F. v. Douglas Cnty. Sch. Dist.*, 137 S. Ct. 988, 993 (2017).

17. A child is considered a "child with a disability" for purposes of the IDEA if he or she exhibits one or more of an enumerated list of conditions and demonstrates a need for special education and related services. 20 U.S.C. § 1401(3)(A).

18. Under New York Education Law 4401(a) "'a child with a disability' or 'Student with a disability' means a person under the age of twenty-one who is entitled to attend public schools pursuant to section thirty-two hundred two of this chapter and who, because of mental, physical or emotional reasons can only receive appropriate educational opportunities from a program of special education."

19. FAPE pursuant to IDEA requires provision of special education, defined as "specially designed instruction . . . to meet the unique needs of a child with a disability," as well as related services, which "are the support services 'required to assist a child . . . to benefit from' that instruction." 20 U.S.C. §§1401(26), (29).

20. An LEA must provide an eligible child with disabilities with such special education and related services in conformity with the child's IEP. *Endrew F*., 137 S. Ct at 994 (citing 20 U.S.C. §1401(9)(D)); *Fry v. Napoleon Cmty. Sch*., 137 S. Ct. 743, 748-749 (2017). The IEP is "the centerpiece of the statute's education delivery system for" children with disabilities. *Endrew F*., 137 S. Ct at 994 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

21. Endrew F. provides the following guidance regarding the provision of FAPE:

   a. The IEP must be appropriately ambitious in light of the child's individual circumstances and unique strengths. *Endrew F*., 137 S. Ct. at 1000. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Id. at 1001.

   b. To that end, each IEP "is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F*., at 999 (quoting 20 U.S.C. §§1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv).

   c. "Every IEP begins by describing a child's present level of achievement, including explaining 'how the child's disability affects the child's involvement and progress in the general education curriculum.'" *Id.* at 1000 (quoting 20 U.S.C. §1414(D)(1)(A)(I)(I)(aa)).

4

  d. "It then sets out a statement of measurable annual goals…designed to…enable the child to be involved in and make progress in the general education curriculum,' along with a description of specialized instruction and services that the child will receive." *Id.* (quoting §§1414(d)(1)(A)(i)(II), (IV)).

  e. "The instruction and services must likewise be provided with an eye toward 'progress in the general education curriculum.'" (quoting §1414(d)(1)(A)(i)(IV)(bb)).

  f. An IEP "must be appropriately ambitious in light of [the child's] circumstances." *Id.* "When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Id.*

22. The requirements outlined in the preceding paragraphs are not merely "procedural" requirements. "[T]he procedures are there for a reason and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs' of a child with a disability." *Endrew F.*, 137 S.Ct. at 1000 (citing 20 U.S.C. §§1401(9) (29)); *see also Fry,* 137 S. Ct. at 753-754 (IDEA's administrative procedures test whether a school has met its obligation to provide meaningful access to education based on individual needs).

23. The Second Circuit Court of Appeals has held that *Endrew F.*, as well as Second Circuit precedent, require an educational program "likely to produce progress, not regression or trivial educational advancement."

24. In a civil action brought under the IDEA to review a state's final administrative determination, the evidence before the court is not necessarily limited to the record that was before the state administrative adjudicators. Rather, the IDEA explicitly provides that "the court . . . shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii); *see generally Handleman v. Bd. of Educ.*, No. 07-CV-6021, 2007 U.S. Dist. LEXIS 77814 at *6-10 (W.D.N.Y Oct. 19, 2007) (summarizing the history of judicial interpretation of 20 U.S.C. § 1415(i)(2)(C)(ii), both within and without the Second Circuit). "In the final analysis, the

decision to admit additional evidence is entrusted to the sound discretion of the court, appreciating that supplemental evidence must be 'relevant, non-cumulative, and useful.'" *A.W. v. Bd. of Educ. of the Wallkill Cent. Sch. Dist.*, No. 14-CV-1583, 2015 U.S. Dist. LEXIS 46346 at *7-8 (N.D.N.Y. Apr. 9, 2015) (citation omitted).

***Section 504 and ADA***

25. "Important as the IDEA is for children with disabilities, it is not the only federal statute protecting their interests." *Fry,* 137 S.Ct. at 749. "IDEA guarantees "individually tailored educational services," but the ADA and Section 504 "promise non-discriminatory access to public institutions…to root out disability-based discrimination, enabling each covered person…to participate equally to all others in public facilities and federally funded programs." *Id.* at 756.

26. "Section 504…is broader than the IDEA; it is concerned with discrimination in the provision of state services to all individuals with disabilities…Section 504's provisions are not expressly affirmative in nature, but the Rehabilitation Act empowers federal agencies to devise regulations aimed at preventing prohibited discrimination." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69,* 815 F.3d 1195, 1203. (9th Cir. 2016).

27. A school district violates Section 504 and the ADA if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services. *Fry,* 137 S. Ct. at 749-750.

28. "Meaningful access" means "evenhanded treatment and the opportunity for [individuals with disabilities] to participate in and benefit from programs receiving federal assistance." *Alexander v. Choate*, 469 U.S. 287, 304 (1985) (citing *Southeastern Cmty. Coll. V.*

6

*Davis*, 442 U.S. 397 (1979)). One legal theory proving denial of meaningful access is a failure to provide a reasonable accommodation.

29. The reasonableness of an accommodation "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to" enjoy meaningful access. *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010). The provision of a particular type of services, such as discrete trial training or structured teaching programs, can constitute reasonable accommodations. *Id.* at 1094.

30. To determine whether a requested accommodation is necessary, courts start by considering how students without disabilities access the school's offerings. Then, the court must determine what reasonable steps will provide students with disabilities with a like experience. *K.N. v. Gloucester City Bd. of Educ.*, No. 17-7976, 2019 U.S. Dist. LEXIS 54076, at *32 (March 29, 2019); *see also J.D. v. Colonial Williamsburg Found.*, No. 18-1725, slip op. at 13 (4th Cir. May 31, 2019).[1]

31. A student who demonstrates that a school district acted with deliberate indifference to his federally protected rights may be entitled to monetary damages. *K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005).

**FACTUAL BACKGROUND**

32. During the relevant time period, T carried diagnoses of verbal apraxia, mild proximal hypotonia, and associated motor planning and coordination difficulties. *SRO Dec.* at

33. At stake in T's education was whether he would learn to speak intelligibly. T was at grave risk of growing up without the ability to speak even a few words or a short sentence

---

[1] *J.D.* is a Title III case, but federal courts have read Titles I-III of the ADA "to create similar, if not identical, standards." *K.N.*, 2019 U.S. Dist. LEXIS 54076, at *32 n.17.

intelligibly. Yet, there were research-based interventions that offered him good prospects for avoiding this fate. In large part, the parties' dispute is over whether the District had to provide T these interventions as part of his IEP.

34. A 2012 diagnostic psychological evaluation yielded results "not quite sufficient for the diagnosis of an autism spectrum disorder ("ASD")" but also revealed "significant limitations in social communication." *SRO Dec.* at 3 n.2.

35. In September 2014, T began attending kindergarten at Wilson Elementary School in the District. During kindergarten (2014-2015) and first grade (2015-2016), T received special education and related services as a student with a speech or language impairment. *SRO Dec.* at 3. At that time, he received integrated co-teaching services twice daily and related services of speech language therapy, occupational therapy ("OT") and physical therapy ("PT"). *SRO Dec.* at 3.

36. During kindergarten (2014-2015) and first grade (2015-2016), Parents provided, at their own expense, a social skills group, speech therapy, OT and PT sessions after school. *SRO Dec.* at 3-4.

37. T's mother, J.S, testified that during kindergarten, District personnel told her that T needed services the District could not provide and suggested seeking ABA through private insurance. T1247.

38. The CSE chairperson testified that District personnel were, at that time, advising parents that they might be able to get ABA services through private insurance. *SRO Dec.* at 21; T78-79.

8

39. In early 2016, the District conducted a functional behavior assessment ("FBA"). At hearing, Parents challenged the adequacy of the FBA because it did not meet state or federal standards and, consequently, did not provide appropriate behavioral supports. *SRO Dec.* at 45.

40. At the end of the 2015-16 school year, T had not achieved 11 of his 17 annual goals. *SRO Dec.* at 30.

41. In April, 2016, discouraged by T's lack of progress, Parents enrolled T at Fit Learning ("Fit"), an ABA program.

42. At the May 2016 IEP meeting, Parents informed the CSE that T would be attending Fit for the summer of 2016. *SRO Dec.* at 21.

43. Mid-summer, J.S. called the CSE Chairperson and told her that T was making good progress in the Fit program and was learning. *SRO Dec.* at 21.

44. During that conversation, J.S. asked the CSE Chairperson if T could depart early from school three days per week during the 2016-2017 school year to attend Fit. *SRO Dec.* at 21.

45. The District maintains an attendance policy, Policy 7110, available at http://www.rvcschools.org/UserFiles/Servers/Server_494023/File/Board%20of%20Education/Policies/Policy_Man%20_Web%20update%205-8-19(2).pdf. Pursuant to that policy, absences, tardiness, and early departures ("ATEDs") from school or classes are either excused or unexcused. Students with unexcused ATEDs are subject to discipline.

46. The SRO found that there was "no evidence . . . that the district was treating the student as truant when the parents picked him up." *SRO Dec.* at 14. Pursuant to the attendance policy above, if T's early departures were unexcused, he would be subject to discipline. By treating T's early departures as excused, the District consented to them.

47. With the District's knowledge and approval, T repeated first grade for the 2016-17 school year, missing classes three times per week to receive 1:1 ABA sessions. He also attended Fit for the 2017-2018 school year. *SRO Dec.* at 12; T90-94, 103-106.

48. District personnel did not seek out evaluative data from Fit to develop or revise T's IEPs. *SRO Dec.* at 23 (CSE chairperson acknowledged that she did not seek data from Fit at November 2016 CSE meeting); 27-28 (school personnel did not seek information from Fit for May 2017 IEP meeting).

49. The District never revised T's IEPs to specify use of an ABA teaching methodology. *SRO Dec.* at 33.

50. At the May 2017 IEP meeting, Parents told the District that they would continue the ABA programming at Fit. *SRO Dec.* at 28.

51. T's special education teacher did not recommend conducting an assessment to determine whether T needed ABA because she didn't think the District had an ABA specialist to make such an assessment. *SRO Dec.* at 28.

52. Parents forwarded a private auditory processing evaluation to the CSE Chairperson after the May 2017 meeting. That evaluation "included recommendations for ABA, ongoing involvement at Fit, and consideration of extending [T's] attendance in a program such as Fit through the school week." *SRO Dec.* at 29.

53. As of October 2017, the District had not reviewed the auditory processing evaluation. *SRO Dec.* at 29.

54. District personnel did not seek out any information regarding T's work at Fit. *SRO Dec.* at 39.

## PROCEDURAL BACKGROUND

*The IHO Hearing and Decision*

55. On July 13, 2017, Parents filed a Due Process complaint ("DP Complaint") pursuant to IDEA, Title II of the ADA, Section 504, and New York state law against the District.

56. The DP Complaint alleged, *inter alia,* that the District: (1) failed to appropriately evaluate T; (2) failed to offer methodologies or strategies based on peer-reviewed research; (3) failed to review the IEP as appropriate; (4) denied T a FAPE for the 2016-2017 and 2017-2018 school years.

57. IHO Martin Schiff (IHO 1) conducted five days of hearing and, upon IHO 1's recusal, IHO Jeffrey J. Schiro (IHO 2) conducted the last two days of hearing. IHO 2 issued his decision on November 8, 2018, denying Parents' claims for compensatory services and the costs associated with the placement at Fit and granting Parents' claim for reimbursement for an independent psychological evaluation.

*The SRO Decision*

58. Parents filed an appeal to the SRO and the District cross-appealed the award of reimbursement for the independent evaluation. The SRO affirmed the denial of Parents' claims and reversed the award of reimbursement for the evaluation.

59. As an initial matter, the SRO held that IHO 2 appropriately applied a *Burlington/Carter* tuition reimbursement analysis in spite of the fact that T continued to attend public school during the time period in question. *SRO Dec.* at 12-13.

60. The SRO rejected Parents' argument that the District failed to conduct appropriate evaluations to plan for the 2016-17 and 2017-18 school years. *SRO Dec.* at 15-18, 25-28.

61. The SRO rejected Parents' argument that the District predetermined its decision not to recommend ABA for T and to fail to include ABA on his IEPs. *SRO Dec.* at 19-25, 28-29.

62. Finding that there had been no procedural violations, the SRO rejected the argument that those violations cumulatively resulted in a deprivation of FAPE.

***Errors by the SRO***

63. The SRO erred in affirming the use of a *Burlington/Carter* tuition reimbursement analysis to determine whether the District should be responsible for T's programming at Fit.

64. The SRO based its conclusion that this was a tuition reimbursement case on the erroneous finding that the "hearing record establishes that the district did not consent to" T's removal to attend Fit. *SRO Dec.* at 13. That finding is not thorough and well-reasoned, as follows:

   a. It is undisputed that the District allowed T's removal and absence from school to attend Fit during the 2016-17 and 2017-18 school years.

   b. It is undisputed that the District did not treat T as truant.

   c. District personnel not only marked T's absences as excused, they actively coordinated with Parents to facilitate T's *de facto* program of a partial school day combined with ABA sessions at Fit. See *SRO Dec*. at 48.

   d. Pursuant to the District's attendance policy, if District personnel did not believe that T needed the services, they *could not* have treated the absences as excused. By not treating T as truant, District personnel were treating the early departures as excused.

   e. Aware of and approving the early departure to attend Fit, and tacitly acknowledging that he needed the services by excusing his early departures, the District deprived T of a *free* appropriate public education by having Parents pay for those services.

65. By treating this as a unilateral placement case rather than a denial of FAPE case, the SRO ignored the fact that, unlike a unilateral placement, T received private services

12

concurrently with his IEP, so that his private ABA directly affected (and was affected by) the District's IEP-based program.

66. The SRO's rejection of the argument that the District did not collect sufficient evaluative data is not thorough and well-reasoned, as follows:

   a. The burden rested with the District to secure and review the most recent evaluative data. *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 110 (2d Cir. 2016)Aware of and approving the early departure to attend Fit, the CSE, at the very least, had a legal obligation to collect, understand, and incorporate educational data and information from the private ABA service provider.

   b. By failing to secure and examine the data from Fit, the CSE failed to grasp T's full potential, progress, and programming needs. The SRO's failure to consider this fact fatally undermines the SRO's conclusion that the District provided FAPE to T without considering the data from Fit.

   c. By treating the early departures as excused, the District conceded the services were appropriate for T. Thus, the SRO erred when he credited the District's argument that it was under no obligation to coordinate with the providers at Fit and seek and consider evaluative information. *SRO Dec.* at 19.

67. The SRO erred in concluding that the FBA conducted in 2016 provided appropriate evaluative information, as follows:

   a. New York regulations define an FBA, in pertinent part, as "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment. 8 NYCRR § 200.1(r).

   b. An FBA must include a baseline of behaviors across activities, times, settings and people, measuring frequency, duration, and latency. *See* http://www.p12.nysed.gov/specialed/publications/topicalbriefs/FBA.htm.

   c. The FBA in this case had no baselines and offered only qualitative observations, such as "often" needing "multiple prompts." It noted "self-directed behavior" that "makes it difficult to determine [T's] true capability." Without explanation, it stated that T "can be off task for a period of time." The FBA Speculated that T's behaviors are "internally rewarding," he "may engage" in task avoidance activities, and he "engages in wandering to obtain tangible objects." The FBA does not explain *what* he avoids or *why* he desires certain things.

   d. The SRO acknowledged that the failure to conduct an adequate FBA is a serious procedural violation. *SRO Dec.* at 41 (citing *R.E. v. N.Y.C. Dep't of Educ.*, 694

13

        F.3d 167, 190 (2d Cir. 2012) and *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 112-113 (2d Cir. 2016).

    e. The SRO found that the February 2016 FBA only addressed some of the regulatory requirements for an appropriate assessment. The SRO erred as a matter of law in holding that an FBA examining inattentiveness and distractibility, as opposed to injurious behaviors or elopement, need not comply with regulatory requirements for an appropriate FBA. *SRO Dec.* at 44.

68. The SRO's finding on predetermination is not thorough and well-reasoned, as follows:

    a. The SRO found that "a fact finder could theoretically have concluded that the district's communications with the parents had convinced the student's mother that the district would, under no circumstances, provide the student with ABA on an IEP." *SRO Dec.* at 23. This finding, combined with the District's tacit approval (by excusing T's early departure for three afternoons a week) of the provision of ABA services at parental expense, supports Parents' contention that the District had predetermined that it would not include those services on an IEP.

    b. The SRO acknowledged that the CSE chairperson advised Parents about the potential benefit of ABA services and that they could seek those services through insurance. The CSE chairperson also testified that if insurance didn't cover the services, the student would not receive those services. *SRO Dec.* at 21. This testimony, combined with the District's tacit approval (by excusing T's early departure for three afternoons a week) of the provision of ABA services at parental expense, supports Parents' contention that the District had predetermined that it would not include those services on an IEP.

    c. The SRO afforded too much deference to IHO 2's weighing of the evidence related to predetermination. *SRO Dec.* at 23. Because IHO 2 only heard the last two days of testimony, he did not observe the demeanor of and was unable to make credibility determinations regarding the District witnesses who testified on this issue.

69. The SRO erred as a matter of law in concluding that T's receipt of ABA programming, with the District's knowledge and tacit approval, for the 2016-17 and 2017-18 school years "without any discussion at the CSE meeting about the student's need for that methodology is *some way along* to a 'pattern of indifference' that could result in a cumulative procedural violation and a finding of a denial of a FAPE." *SRO Dec.* at 30 (emphasis added).

14

Two full school years of provision of outside ABA programming – during the school day and with excused early departures – without any effort by the District to look at the data from that programming is not "some way along" to a pattern of indifference. It is a long-established pattern of blatant disregard for its obligation to provide an appropriate education at public expense.

70. As a consequence of erroneously concluding that the District was only "some way along to a pattern of indifference," the SRO ordered consideration of ABA at the next annual review, instead of ordering reimbursement for services provided by the Parents.

71. The SRO erred in finding that T's IEPs were substantively appropriate, as follows:

   a. In finding that the IEPs had adequate and appropriately ambitious goals, the SRO disregarded the fact that the goals lacked baselines or at times appeared to reflect targets that were the same as his baseline level of performance

   b. The SRO ignored the fact that T continued the same goals year to year in many areas without a meaningful change in programming to address the lack of progress.

   c. T's IEPs were substantively deficient because the teachers' *ad hoc* behavioral interventions, which lacked rigor and consistency, were not sufficient to address his interfering behaviors. The SRO relied upon inapposite precedent in concluding that T did not need a Behavior Intervention Plan ("BIP"). *See SRO Dec.* at 44. The lack of a BIP not only resulted in a deficient program but also deprived Parents of the ability to participate in shaping T's behavioral program.

   d. The SRO's finding that the "hearing record does not include a 'clear consensus' regarding a specific teaching methodology," *SRO Dec.* at 35, is based in large part on his erroneous ruling that the CSE need not consider the Fit data because it was a unilateral parental placement. If the SRO approached this as a straightforward denial of FAPE case, the CSE would have had to consider the Fit data to determine whether T needed ABA services.

   e. Similarly, the SRO based its rejection of the failure to implement claim on the Parents' alleged decision "to unilaterally remove the student from the public school for a portion of the regular school day several days per week." *SRO Dec.* at 48. Consequently, the SRO endorsed the District's "reasonable and practical decision to deliver as much of the student's special education services" as possible. *Id.* However, having drafted IEPs contemplating split-time between the

public school and the private ABA program, the District was obligated to draft a program that could be delivered as written.

## COUNT I
## Violation of IDEA

72. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this complaint.

73. T is a child with a disability entitled to special education and related services under IDEA.

74. Defendant violated IDEA and Article 89 of the New York State Education Law. N.Y. Educ. Law § 4402.

75. The SRO erred in finding that the District provided T with FAPE for the 2016-17 and 2017-18 school years.

76. The SRO's Decision is erroneous, misconstrues the record and applicable review standards, and is contrary to both law and statute.

## COUNT II
## Violation of Section 504 and the ADA

77. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs of this complaint.

78. T is a qualified individual with a disability under § 504 and the ADA.

79. The District is a recipient of federal funds subject to § 504 and a public entity subject to Title II of the ADA.

16

80. Section 504 and the ADA prohibit discrimination on the basis of disability, including the denial of reasonable accommodations necessary to provide meaningful access to educational services.

81. District employees, by failing to provide the reasonable accommodation of ABA instruction, acting with deliberate indifference, excluded T from participation in and/or denied him the benefits of services, programs and/or activities of the District.

82. This exclusion was by reason of T's disability, in violation of Section 504 and the ADA.

83. As a direct and proximate result of Defendants' intentional and/or deliberately indifferent actions, T was denied access to educational services in violation of Section 504 and the ADA and suffered damages as further set forth herein.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction of this action;

(b) Receive the administrative record;

(c) Admit additional evidence at the request of Plaintiffs pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

(d) Reverse the decision of the SRO and declare that the District failed to offer T a FAPE for the 2016-2017 and 2017-2018 school years under IDEA;

(e) Declare that the District violated Section 504 and the ADA by denying T a reasonable accommodation to ensure meaningful access to educational benefits;

(f) Order the District to reimburse Parents for the costs of providing the Fit Leaning program to T from April, 2016 to the end of the 2017-18 school year;

(g) Order the District to reimburse Parents for the costs of transporting T to and from Fit Learning's program from April, 2016 through the end of the 2017-18 school year, in accordance with the Internal Revenue Service's standard

    mileage rate used to calculate the deductible costs of operating an automobile for business purposes;

(h) Order that District provide compensatory services for failure to implement T's IEPs during the 2016-17 and 2017-18 school years;

(i) Declare that Plaintiffs are "prevailing parties" in this matter;

(j) Order, pursuant to Section 504 and the ADA, reimbursement for expert costs incurred by Parents, including but not limited to the costs of Dr. Blass' June 5, 2017 evaluation;

(k) Award Parents' reasonable attorney's fees and costs; and

(l) Grant such other and further relief as the Court deems just and proper.

Dated: June 10, 2019

Respectfully submitted,

*/s/ Gina M. DeCrescenzo*
Gina M. DeCrescenzo
GINA DeCRESCENZO, P.C.
180 South Broadway, Suite 302
White Plains, NY 10605
t 914.615.9177
f 914.615.9176
gina@decrescenzolaw.com