UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
 D.S. and J.S., *individually and on behalf of T.S.*,

        Plaintiffs,

   -against-

ROCKVILLE CENTRE UNION FREE SCHOOL
DISTRICT,

        Defendant.
------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

19-CV-03430 (JMW)

**WICKS,** Magistrate Judge:

## I. PRELIMINARY STATEMENT

  Plaintiffs D.S. and J.S. (collectively "Plaintiffs" or the "Parents") commenced this action

individually and on behalf of their son, T.S., against Rockville Centre Union Free School District

("Defendant" or "District") pursuant to the Individuals with Disabilities Education Improvement

Act of 2004 ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), Article 89 of the New York State Education

Law, N.Y. Educ. Law § 4404(3), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and

Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. (DE 1.)  The

Plaintiffs seek review of the final administration decision of the New York State Review Officer

("SRO") regarding the provision of a free appropriate public education ("FAPE") to T.S.  *Id.*

  The parties in this action consented to this Court's jurisdiction for all purposes pursuant

to 28 U.S.C. Section 636(c) and Federal Rules of Civil Procedure 73.  (DE 10; DE 11.)  Plaintiffs

now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that

the SRO erred in its decision finding that the Defendant did not fail to offer a FAPE to T.S. as

required by the IDEA.  (DE 33-1.)  Defendant cross-moves for summary judgment arguing that

the SRO correctly affirmed the decision of the Impartial Hearing Officer ("IHO") based on a

thorough and careful review of the record. (DE 32-1.) For the reasons that follow, Plaintiffs'
motion for summary judgment is DENIED and Defendant's motion for summary judgment is
GRANTED.

## II. BACKGROUND

### A. The Undisputed Material Facts

T.S. is a student classified as IDEA-eligible under the classification of "speech or
language impairment" and resides within the geographical boundaries served by the District.[1]
(DE 33-2 ¶¶ 1, 3.) As an infant, T.S. was diagnosed with apraxia of speech and began receiving
special instruction through an Early Intervention Program ("EIP") during elementary school. (*Id.*
¶¶ 11–12.) T.S. was also approved for physical therapy and occupational therapy in December
2011 and began receiving such services in April 2012 and January 2012, respectively. (*Id.* ¶¶
13–14.)

When T.S. transferred from the EIP to the District, the Committee on Preschool Special
Education ("CPSE") arranged for a psychological evaluation, conducted in April 2012, to
determine T.S.'s eligibility for special education services. (*Id.* ¶ 15.) Dr. Alan Wenderoff
completed a diagnostic psychological evaluation in May 2012 using autism assessments, the

---

[1] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement means that the Court has deemed the
underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the
documents cited in it. Where relevant, however, the Court may cite directly to an underlying document. The Court
has deemed undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible
evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-CV-12297, 2020 WL 6712267, at *8 (S.D.N.Y.
Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1, the movant's statements are deemed to be admitted where [the
non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C.
Hous. Auth.*, No. 03-CV-2746, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v.
Dinow*, No. 06-CV-3881, 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that
disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or
denial by general reference to an exhibit or affidavit does not specifically controvert anything."). Additionally, to the
extent [a party's] Rule 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts
asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such]
statement[s.]" *McFarlane v. Harry's Nurses Registry*, No. 17-CV-6350, 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr.
2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

results of which "were 'not quite sufficient for the diagnosis of an autism spectrum disorder,' yet 'significant limitations in social communication' were evident," and the evaluator recommended a specialized and intensive placement with educational and therapeutic supports.  (*Id*. ¶¶ 16 –18.)  T.S. first attended 10:1+2 special classes and later transitioned to an 8:1+2 placement.  (*Id*. ¶¶ 19–20.)  The preschool also provided T.S. with an augmentative communication device, which T.S. ultimately did not use when it appeared that it was no longer effective.  (*Id*. ¶ 21.)

T.S. attended kindergarten during the 2014–2015 school year and first grade during the 2015–2016 school year, and he repeated the first grade for the 2016–2017 school year.  (DE 32-4 ¶¶ 8–9.)

During the CSE meeting held on May 15, 2015, the CSE reviewed evaluations, noted T.S.'s progress on his goals, and developed a plan for the 2015–2016 school year.  (*Id.* ¶ 10.)  The CSE recommended an integrated co-teaching class ("ICT"), and the Parents did not raise any concerns regarding the CSE recommendation at that time.  (*Id*. ¶ 12.)  Another CSE meeting occurred on March 1, 2016 to review the Functional Behavior Assessment ("FBA") conducted by Dr. Josephine Bishop and Dr. Gordon Wood.  (*Id.* ¶ 17.)  At the meeting, Drs. Bishop and Wood presented the results of their observations and discussed the FBA and the current program for TS.  (*Id*. ¶¶ 17–18.)  The FBA indicated that T.S. was "distracted, tried to avoid some tasks, and was resistant at times."  (*Id*. ¶ 20.)

The CSE recommended that T.S. receive the support of the classroom aide for two periods daily.  (*Id.* at ¶ 25.)  The Parents requested additional services at home, which the CSE agreed to provide one time weekly for sixty minutes to reinforce materials that T.S. was taught in school.  (*Id*. ¶ 26.)  A 1:1 aide was assigned for two periods each day to keep T.S. on task, to

keep him safe, and to redirect and prompt him." (*Id*. ¶ 33.)  At the same time, "T.S. was receiving the weekly sixty-minute home instruction from a special education teacher." (*Id*. ¶ 34.)

Dr. Orly Gadon, the District's CSE Chairperson, testified that based on the input from the special education teacher and providers and a review of the goals, T.S. was making progress, albeit slowly. (*Id*. ¶¶ 39–40.)  Another CSE meeting took place on May 13, 2016, where CSE recommended Extended School Year ("ESY") services of occupational therapy ("OT") and speech and language therapy to T.S. (*Id*. ¶¶ 42, 45.)  The CSE further recommended the ICT class for the 2016–2017 school year. (*Id.* ¶ 48.)  The Parents advised the District at this meeting that T.S. "will attend a private program for the summer." (*Id*. ¶ 49.)  The Parents did not request additional services for the summer of 2016 from the District. (*Id*. ¶ 50.)  Before the 2016–2017 school year began, the Parents contacted Dr. Gadon and requested that T.S. be allowed to leave school at 12:15 p.m. three days a week to attend Fit Learning ("Fit"), to which Dr. Gadon stated that the school could not give such permission. (*Id*. ¶¶ 51–52.)

Another CSE meeting was held on November 15, 2016 to review the augmentative communication evaluation and recommended a device called "Nova Chat," which was meant to improve T.S.'s oral language and to provide more meaningful communication. (*Id*. ¶¶ 55–56.)  Both the Parents—along with Dr. Kim Berens, representative from Fit who was at the CSE meeting—agreed with the recommendation for the augmentative device. (*Id*. ¶¶ 60–61.)  However, the Parents returned the device because, in their opinion, it served more as a distraction than an assistive device and discouraged T.S. from using his developing language skills. (DE 35 ¶ 62.)  Despite this, T.S. continued to use the device extensively in the classroom. (DE 32-4 ¶ 67.)  For example, Victoria Reicherter, T.S.'s special education teacher, utilized

4

Nova Chat in the classroom when it was difficult to understand T.S., and T.S. enjoyed the technology and liked to work and play with Nova Chat.  (*Id.* ¶¶ 63, 66.)

T.S. began attending Fit in June 2016 and was attending three days per week in the fall of 2016.  (*Id.* ¶ 68.)  Dr. Gadon held an informal meeting with all T.S.'s providers and special education teachers to ensure that his IEP services were provided to him, despite his attending Fit during the school day.  (*Id.* ¶ 69.)  T.S. received special education instruction from Ms. Reicherter in the classroom for eighty minutes each day.  (*Id.* ¶ 70.)  Additionally, T.S. was provided with a general education teacher, a teaching assistant, and a classroom aide.  (*Id.* ¶ 71.)  Ms. Reicherter continued to provide all mandated special education services in the morning before T.S. left for Fit at 12:15 p.m., utilizing technology, including an iPad and a Smart Notebook to improve T.S.'s attention to task.  (*Id.* ¶¶ 73, 75.)

The District also utilized a reading program for T.S. to work on phonics, phonemic awareness, and letter sounds.  (*Id.* ¶ 77.)  Ms. Reicherter further provided one-to-one services to T.S. by pulling him out of the classroom; implementing all the classroom modifications and testing accommodations in the May 2016 IEP; and using positive behavior strategies, including positive reinforcement, checklists, motor breaks, and visuals.  (*Id.* ¶¶ 78–80.)  Furthermore, she worked on IEP goals.  (*Id.* ¶ 81.)  The record indicates that T.S. was progressing satisfactorily in his reading goal, was an excellent decoder, and was able to read.  (*Id.* ¶ 82.)  The record further establishes that Ms. Reicherter worked on the math goal, in which T.S. was progressing, although not consistently.  (*Id.* ¶ 83.)  For example, he was not generalizing and needed a lot of prompts.  (*Id.*)  Addressing the issues of generalization, Ms. Reicherter worked on math vocabulary, simple word problems, and algorithms.  (*Id.* ¶ 85.)

The record also reflects that T.S. received most of his mandated sessions of speech services in school, although he may have missed one session a month due to leaving for Fit. (*Id.* ¶ 88.) For the three days a week that T.S. left school at 12:15 p.m., T.S. missed math, social studies, science, recess, among other activities. (*Id.* ¶ 90.) Ms. Reicherter tried to make up as much work as possible to make up for the time T.S. spent at Fit and kept a folder of all the work he had missed. (*Id.* ¶ 93.)

The District held another CSE meeting on May 1, 2017 where the CSE team reviewed T.S.'s progress in all areas. (*Id.* ¶ 94.) The CSE noted T.S.'s areas of strength, including in reading, decoding, spelling, and some math skills. (*Id.* ¶ 97.) It was further noted that writing was difficult for T.S., but he was making progress. (*Id.* ¶ 98.) Although the parties debate which subjects he was progressing and the extent of this progress, it is clear from the record that T.S. was making slow and, at times, inconsistent progress. (DE 35 ¶ 101.)

T.S.'s speech provider reported that he was progressing, that he could speak more words, and was making progress with "wh" questions. (*Id.* ¶ 100.) A Physical Therapy ("PT") evaluation was reviewed, and the PT provider stated that T.S. was making progress. (*Id.* ¶ 105.) The program recommendation for the 2017–2018 school year was an ICT class. (*Id.* ¶ 109.) The home educational services were discontinued at the Parents' request. (*Id.* ¶ 111.) The Parents indicated that they wanted T.S. to continue to attend Fit, but at no time did they request that the CSE recommend the program or that they were doing so at public expense. (*Id.* ¶ 112.) However, the Parents submitted an evaluation to the CSE from Lindsay Blass, Psy.D., which found that "[T.S.] requires the continued structure and individualized attention provided through an ABA-based program in order to further decrease his stereotypical behaviors and to improve joint attention, increase eye contact, and provide for his current academic needs. Fit Learning is

6

currently addressing this requirement. . . . [T.S.] should be attending Fit Learning on a daily basis, for at least three hours per day." (DE 19 at 293.)  Dr. Blass testified that she spoke to T.S.'s special education teacher, Ms. Reicherter, in March 2017.  (DE 18 at 1290.)  She *thinks* Ms. Reicherter "stated flat out to [her] that [T.S.] requires ABA [instruction]." (*Id.* at 1291 (emphasis added).)

In March and April 2017, the Parents obtained a private evaluation of T.S. by Lindsay Blass, Psy.D., a clinical psychologist.  (DE 33-2 ¶ 103.)  Dr. Blass testified as an expert in psychological testing and child development and advised that T.S. needed "intensive language therapy to increase his functional communication skills." (*Id.* ¶¶ 104, 107.)  Dr. Blass observed that T.S. appeared to have "improv[ed] motor speech output . . . with the additional structure and individual guidance provided at the Fit Learning program," and commented that "[h]e clearly seems to be benefitting from the individualized, fast-paced, structured instruction provided in this specialized educational setting," referring to ABA programming at Fit Learning.  (*Id.* ¶ 108.)  Dr. Blass recommended ABA programming to improve T.S.'s attention "and provide for his current academic needs," finding that Fit Learning was addressing that requirement, and its ABA data collection demonstrated progress in the program.  (*Id.* ¶ 110.)

After the May 2017 CSE meeting, the Parents provided the CSE with a privately conducted auditory evaluation by Dr. Donna Geffner.  (DE 32-4 ¶ 113.)  The District attempted to convene a CSE meeting multiple times to review the additional evaluations, but the Parents cancelled.  (*Id.* ¶ 115.)  During the 2017–2018 school year, TS continued to attend Fit but would leave school at about 2:15 p.m. instead of 12:15 p.m., and the staff continued to attempt to provide all core subjects and related services in the morning.  (*Id.* ¶¶ 116, 118.)

7

Around February or March of 2018, the Parents attended a parent-teacher conference where they were told that T.S. was struggling as the work became harder, so he was being provided a parallel curriculum.  (*Id*. ¶ 124.)  The CSE modified T.S.'s work and did their best to give him access to the second-grade curriculum and in accordance with his IEP goals.  (*Id*. ¶ 125.)  The record then indicates that T.S. was progressing gradually following multi-step directions in writing and progressing inconsistently on his math goal.  (*Id*. ¶ 129.)

### B.     Procedural History

On July 13, 2017, Plaintiffs filed a request for an impartial due process hearing pursuant to IDEA and New York's regulation implementing IDEA, the ADA and Section 504.  (DE 33-2 ¶ 4.)  After seven days of hearing, the IHO determined that Defendant offered T.S. a FAPE for the school years at issue in the case, thus denying the Parents' requests for reimbursement for the placement at Fit.  (DE 1 ¶ 57.)

Following the IHO's decision, Plaintiffs filed an appeal with the SRO.  (*Id*. ¶ 58.)  On appeal, Plaintiffs alleged that the IHO erroneously concluded that Defendant offered T.S. a FAPE during the 2016–2017 and 2017–2018 school years.  (*Id*. ¶ 62.)  The SRO determined that the record established that T.S. was offered a FAPE for the school years at issue.  (*Id*. ¶ 65.)  Therefore, the SRO dismissed Plaintiffs' appeal in its entirety.  The Plaintiffs now have filed an appeal to this Court to review the SRO's decision.

### III.  LEGAL STANDARD

### A.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

8

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. *Id.* at 257. If the movant provides such affirmative evidence, then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citing *Scotto v. Almenas*, 143 F.3d 104, 114 (2d Cir. 1998)).

The same standard, of course, applies to cross-motions for summary judgment. *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. Cnty. of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014). Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121; *see also Chartis Seguros*

9

*Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).  But

where, as here, "the motion and cross-motion seek a determination of the same issue[s], the

Court may consider them together."  *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-

CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros*, 3 F. Supp. 3d at

179.

      **B.**    **Statutory Framework**

The IDEA states that, as a condition of accepting federal funding, schools must provide a

FAPE, that is, a free and appropriate public education to all children with disabilities. 20 U.S.C.

§§ 1400(c), 1401(18); *see K.P. v. Juzwic*, 891 F. Supp. 703, 707 (D. Conn. 1995).  The IDEA

emphasizes special education and related services "designed to meet a child's unique needs, to

assure that the rights of children with disabilities and their parents or guardians are protected . . .

and to assess and assure the effectiveness of efforts to educate children with disabilities."  *Id.*

An IEP is created to determine the appropriate education for a student.  *Id.*  The IEP "is a

comprehensive statement of the educational needs of a child, containing the specialized

instruction and related services designed to meet this child's unique needs."  *Id.*  "The IDEA

ensures an 'appropriate' education, but school districts are not required to 'maximize' the

potential of students with disabilities."  *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 510

(S.D.N.Y. 2013) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 189, 199 (1982)).

IDEA cases are generally resolved on summary judgment at the district court level.  *GB

v. N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 244 (S.D.N.Y. 2015) (citation omitted).  A motion

for summary judgment in an IDEA action differs from an ordinary summary judgment motion

under Federal Rule of Civil Procedure 56 in that the existence of a disputed issue of fact will not

defeat the motion.  *Id.*  Rather, "[a]n IDEA summary judgment motion . . . merely 'serves as a

pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.'" *R.G. v. N.Y.C Dep't of Educ.*, 980 F. Supp. 2d 345, 359 (E.D.N.Y. 2013) (citing *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005)).

As a procedural safeguard, a parent who believes that an IEP is insufficient may challenge it at a hearing before an IHO appointed by the local school district.  20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a).  "At [such] hearing[s], the school district has the burden of demonstrating the appropriateness of its proposed IEP.  The decision of an IHO may be appealed to an SRO, whose decision may in turn be challenged in either state or federal court." *R.G.*, 980 F. Supp. 2d at 350 (citations omitted).  A district court is then authorized to "grant such relief as the court determines is appropriate" based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

For IDEA cases brought before the district court, "'[d]eference to administrative findings is particularly appropriate when the state hearing officers' review has been thorough and careful.'" *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 581 (S.D.N.Y. 2012) (citing *P. ex rel. Mr. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008)).  However, an SRO's determination of a pure question of law is not subject to deference.  *Ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 420 (S.D.N.Y. 2011).  Indeed, judicial review of state administrative decisions is strictly limited by the IDEA.  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 239 (2d Cir. 2012).  Courts have determined that the questions of whether an IEP adequately addresses a student's behaviors and whether strategies for dealing with those

behaviors are appropriate are "precisely the type[s] of issues upon which the IDEA requires deference to the expertise of the administrative officers." *Id*. (citation omitted).

### C.    Section 504 and the ADA

The ADA prohibits a public entity from discriminating based on disability. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017). "Section 504 applies [this] prohibition to any federally funded program or activity. *Id*. (citing 42 U.S.C. §§ 12131, 12132; 29 U.S.C. § 794(a)). Thus, any regulation implementing the ADA requires a public entity to make "reasonable modifications to its policies, practices, or procedures when necessary to avoid such discrimination." *Id*. (citing 28 C.F.R. § 35.130(b)(7) (2016)). Courts have interpreted Section 504 as requiring "certain reasonable modifications to existing practices in order to accommodate persons with disabilities." *Id*. (citing *Alexander v. Choate*, 469 U.S. 287, 299–300 (1985)). These statutes "authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." *Id*. at 150 (citing 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133).

However, Section 504 demands that "if a suit brought under such a law 'seek[s] relief that is also available under' the IDEA, the plaintiff must first exhaust the IDEA's administrative procedures." *Id*. at 748 (quoting 20 U.S.C. § 1415(l)). But exhaustion is not required when the crux of the plaintiff's suit is something other than the denial of a free appropriate public education as required under the IDEA. *Id*. Therefore, "the exhaustion rule depends on whether a lawsuit seeks relief for the denial of a free appropriate public education." *Id*. at 754. If the plaintiff's suit alleges such a denial, "the plaintiff cannot escape Section 1415(l) merely by bringing their suit under a statute other than the IDEA." *Id*. The case must first be brought to an IDEA hearing officer, "experienced in addressing exactly the issues the case raises." *Id*.

Nonetheless, the court must look to substance of the complaint rather than the labels used on the surface to determine the claim's nature.  *Id.* at 755.

A complaint that asserts denial of free appropriate education may also assert a discrimination claim of a failure to provide a reasonable accommodation.  *Id.* at 756.  Plaintiffs may seek relief under Section 504 and Title II of the ADA "irrespective of the IDEA's free appropriate public education obligation" if that is the crux of the complaint.  *Id.*  To determine whether the crux of complaint is a discrimination claim under Title II and Section 504, the court must consider: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school?"; and (2) "could an adult at the school . . . have pressed essentially the same grievance?"  *Id.* at 756 (emphasis is original).  When the answer is no to both questions, it is likely the crux of plaintiff's complaint concerns the denial of free appropriate public education, and therefore plaintiff must first bring their case to a hearing officer, experienced in addressing exactly the issues the case raises.  *Id.* at 754, 756.

With these principles in mind, the Court must analyze whether the complaint seeks relief for the denial of an appropriate education.

## IV.   DISCUSSION

The central issue before the Court is whether the SRO correctly decided that T.S. was not denied a FAPE as mandated by the IDEA, and therefore, whether Defendant should be required to reimburse the Plaintiffs for enrolling T.S. at Fit Learning for the 2016–2017 and 2017–2018 school years.  (DE 33-1 at 25–26.)  The Defendant argues that the IEP recommended by the CSE was appropriate and in compliance with the IDEA, and therefore, the Parents should not be reimbursed for unilaterally enrolling T.S. in Fit Learning without the District's approval.  (DE 32-5 at 10.)  According to 20 U.S.C. § 1415(i)(2)(C), the role of the reviewing court is to "(i) []

13

receive the records of the administrative proceedings; (ii) [] hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, [] grant such relief as the court determines is appropriate." Before the Court are two cross-motions appealed from the SRO decision. Upon reviewing the administration record below, the Court finds that the Student was offered a FAPE in compliance with the IDEA.

### A. The SRO's finding that the District provided a FAPE to T.S.

Though the district court may review the administrative decisions of the SRO, the judicial review is restricted and must afford "due weight" to the administrative proceedings, as the IHO and SRO have "specialized knowledge" and more extensive experience with matters of education policy. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112–113 (2d Cir. 2007) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). Deference to the SRO decision is especially proper when its review of the matter has been "thorough and careful." *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) (citation omitted). Deference is also important as it prevents the district court from impermissibly inserting its own views of educational methodology and policy. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005). This deferential standard should be disregarded only where the SRO's is not "'reasoned and supported by the record.'" *M.H.*, 685 F.3d at 241 (quoting *Gagliardo*, 489 F.3d at 114).

Plaintiffs argue that the IDEA demands strict compliance to provide a FAPE to children with disabilities. (DE 33-1 at 4–5.) To do this, the District must meet the unique needs of the disabled child with support services required to assist the child and provide the child with special education and related services in conformity with the IEP. (*Id.* at 5.) The IEP must be "appropriately ambitious" given circumstances and child's strengths, and it must be constructed

after "careful consideration of the child's present levels of achievement, disability, and potential for growth." (*Id*.)

The District's argument is that deference should be given to the IHO and SRO decisions. (DE 32-2 at 6–9.)  Critical to that argument is that the IHO and SRO are in the best positions to determine the credibility of evidence and witness testimony.  (*Id*. at 8.)  Furthermore, deference to the administrative decision precludes the court from interjecting its own inexperience with educational methodology.  (*Id*. at 9.)

The Court agrees that the SRO had substantial evidence before it to determine that the District provided "specially designed instruction . . . to meet the unique needs of a child with a disability," as well as related services, which "are the support services 'required to assist a child . . . to benefit from' that instruction."  20 U.S.C. §§ 1401(26), (29).  Furthermore, the SRO could properly determine that the IEPs created by the District were adequate given the unique circumstances of T.S.  The record is replete with examples of the District evaluating the circumstances of T.S. and updating his IEPs accordingly.  For example, the record indicates T.S. was progressing in his reading goals, and, although inconsistently, T.S. was seeing progress in mathematics.  (DE 32-4 ¶¶ 82–83.)  The CSE held regular meetings to discuss T.S. progress and goals and developed IEPs that spoke to his strengths and deficits.  (*Id*. ¶¶ 94, 97.)  The CSE also performed numerous evaluations to determine what services should be provided for his education, which included a speech language provider and physical therapy provider, and made recommendations accordingly.  (*Id*. ¶¶ 100, 105.)  In fact, the only record of T.S. being denied services comes from the Parents, namely the Parents return of an augmentative communication device (DE 33-2 ¶ 21) and their request to discontinue home educational services (32-2 ¶¶ 109–111)).  In light of the SRO's "thorough and careful" determination supported by the record,

*M.C.*, 226 F.3d at 66, the Court gives deference to the SRO's determination and concludes that it correctly decided that Defendant did offer a FAPE for the 2016–2017 and 2017–2018 school years.

### i.   The SRO correctly applied the *Burlington/Carter* Framework

To determine whether a parent is entitled to reimbursement for expenses associated with enrolling a student in private placement, the courts apply the three-step *Burlington/Carter* analysis. *W.A. v. Hendrick Hudson Sch. Dist.*, 927 F.3d 126, 146 (2d Cir. 2019). The court first assesses whether the school district provided a FAPE; if it did not, the court moves on to the second and third steps, "under which the parents bear the burden of showing that their unilateral private school placement was appropriate for the child's needs and that the equities work in their favor." *Id*. (citation omitted).

Parents enrolled T.S. in Fit in June 2016 and attended four days a week.  (DE 33-1 at 7.) Prior to his enrollment in Fit, Plaintiffs state that T.S. had achieved only 6 of his 17 annual IEP goals, and that, despite this low level of achievement, the 2016–2017 IEP continued the prior level of services.  (*Id*.)  Fit created a plan to reduce incompatible behaviors and accelerate behaviors conducive to learning.  (*Id*.)  Plaintiffs claim that T.S. exhibited behaviors incompatible with instruction at the April 2016 intake assessment, including "flopping out of his chair, high rates of hand and vocal stereotypy, and general inattentiveness." (*Id*.)  Plaintiffs further claim, and Defendant contests, that the data prior to ABA instruction showed that T.S. was not progressing.  (*Id*. at 8.)

During summer 2016, J.S. shared with the CSE that T.S. was showing progress with Fit and shared their intention to continue Fit for part of the school day.  (*Id*.)  The CSE did not convene to consider whether ABA instruction should be included in the IEP.  (*Id*.)  The Parents

16

continued to pick up T.S. three days a week, and the absences were not treated as unexcused (as evidenced by the District's truancy policy).  (*Id*.)  Plaintiffs claim this is "tacit approval" that ABA instruction was required.  (*Id*.)  The Parents claim to have shown the special education teacher video from Fit and allege that the teacher stated the school could not provide the services that Fit does.  (*Id*. at 9.)  Dr. Berens, a representative of Fit, provided progress report after 190 hours of instruction, indicating T.S. made substantial progress.  (*Id*. at 9–10.)

Plaintiffs state that, prior to ABA instruction, T.S. was not progressing on measures used by District.  (*Id* at 10.)  During the 2015–2016 and 2016–2017 school years, the District regularly tested its students in standardized reading and math tests from Northwest Evaluation Association ("NWEA").  (*Id*.)  Plaintiffs claim that T.S.'s results were stagnant until winter 2017 and improved being winter 2017 to spring 2017.  (*Id*.)  Plaintiffs claim that the District's instruction was not researched-based, as was Fit's, and that District did not implement a BIP to decelerate behaviors interfering with learning.  (*Id*.)  However, Fit did implement a BIP.  (*Id*.)  Dr. Lindsay Blass performed eval in 2017, which confirmed benefits of Fit Learning.  (*Id*. at 10–11.)  Although the 2017 evaluation from Dr. Blass states that ABA instruction benefited T.S., there is no indication that this particular instruction was necessary to fill a void in the IEP provided by the District.

Plaintiffs argue that the proffered IEP was not appropriate, and that the SRO erred by only considering that fact that T.S. was progressing when evaluating whether the IEP was appropriate.  (*Id*.)  Plaintiffs further argue that, unlike *Burlington/Carter*, here the District "tacitly consented" to private services when they were aware of T.S.'s early departure to participate in ABA instruction and did not treat him as a truant.  (*Id*. at 11.)

17

Defendant underscores that the SRO found that, since it was the Parents and not the District that removed the child from school and unilaterally placed them in Fit learning, the Parents were not entitled to reimbursement.  (DE 32-1 at 6–7.)  Defendant further argues that Plaintiffs' assertion that District tacitly consented is not supported by the record, and that the District's IEPs do not contemplate T.S. leaving school to attend Fit.  (*Id*. at 9–10.)  Defendant also states that the SRO did not make any determination on appropriateness of Fit and therefore could not have relied on T.S.'s reported progress at Fit to examine retrospective evidence.  *Id*. Defendant states that progress is not retrospective testimony, and that the SRO had to look at 2015–2016 progress to determine that the 2016-17 IEP was appropriate.  (*Id*. at 10.) "[T]estimony may be received that explains or justifies the services listed in the IEP." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012) (citation omitted).

Here, the SRO concluded, and the Court agrees, that the District did offer a FAPE to T.S. for the relevant school years.  Furthermore, the equities would favor not awarding reimbursement to the Parents, as the Parents never requested ABA services from the District, which would have provided the opportunity to seek means other than expensive private programming for this instruction.  The Parents' argument that the District did not treat T.S. as a truant is a sign of its consent is unavailing and tenuous at best.

Moreover, there is no evidence that T.S. generalized skills learned at Fit and applied them to IEP-based program, nor is there evidence that he benefited from Fit.  There is significant evidence to suggest that T.S.'s progress was slow and inconsistent before and during his attendance at Fit.  In spring 2017, the Parents asked Ms. Wohlleben to provide speech and language services because T.S.'s articulation was slipping, and according, according to Defendant, "Fit was not Ms. Wohlleben."  (DE 32-1 at 11.)  This suggests that even instruction

18

provided by Fit was sometimes inconsistent.  It is impossible to determine that T.S.'s progress is solely attributable to private programming at Fit.  T.S. received considerably more hours in the District's program than at Fit.  The Parents even expressed they were pleased with progress seen from the District's programming.  Accordingly, the Court concludes that Defendant did indeed offer T.S. a FAPE for the relevant school years.

>    ii.    **The SRO did not err in holding that the FBA-BIP complied with federal and state law**

The IDEA requires that when a student's "behavior impedes the child's learning or that of others," the CSE must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).  When a student's "behavior impedes his or her learning or that of the others," state regulations require the CSE to conduct a functional behavior assessment ("FBA"), which provides detailed information about a student's behavior.  8 N.Y.C.R.R. § 200.4(b)(1)(v).  The CSE must also create a behavioral intervention plan ("BIP"), which provides strategies to reduce the problem behavior.  8 N.Y.C.R.R. § 200.22(a)-(b).  The CSE need not conduct an FBA or create a BIP if it concludes that the child's behavior does not warrant one.  *See R.E.*, 694 F.3d at 195 (concluding that an FBA was not required when "the CSE considered the evidence of [the student's] behaviors and determined that they were not severe enough to warrant" one).  Even if a student's behavior does impede the child's learning or that of others, the Second Circuit has held that the failure to conduct an FBA "does not compel the conclusion" that the IEP developed was "legally inadequate," so long as the government complies with its obligation to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009) (quoting 20 U.S.C. § 1414(d)(3)(B)(i)).

The Plaintiffs argue that failure to conduct an appropriate FBA is a serious procedural violation for a student with significant interfering behaviors and the District needed sufficient information to create a plan to address the behaviors.  (DE 33-1 at 12–13.)  Defendant argues there was no need to keep data since interventions utilized by staff members were effective.  (DE 32-1 at 16.)  For example, T.S.'s general education classroom teacher noted that T.S. was improving on maintaining eye contact, and she therefore was able to observe and see such improvement, obviating a need to maintain unnecessary data.  (*Id*.)

The SRO did find facts establishing that T.S.'s behaviors impeded his education.  (DE 33-1 at 13.)  However, it found that the District did not have to perform a traditional FBA/BIP because T.S.'s behaviors were not "disruptive or aggressive."  (*Id*.)  Plaintiffs contend that "disruptive or aggressive" behavior in not the appropriate standard, and that the 2016 FBA-BIP did not meet state and federal standards to provide appropriate behavioral supports.  (*Id*.)

The SRO further held that T.S.'s behaviors were not sufficiently serious enough to warrant an FBA.  (*Id*. at 14.)  The SRO relied upon *T.M. v. Cornwall Central School District*, 752 F.3d 145 (2d Cir. 2014) for the proposition that it is "not necessary to use an FBA and BIP to address concerns including distractibility, inattentiveness and difficulty remaining on task." Plaintiffs argue that *T.M.* stands for the proposition that the school district must address behaviors that interfere with learning, not that that the school district need not address distractibility, inattentiveness, and remaining on task.  (DE 33-1 at 15.)

Defendant argues that Plaintiffs misconstrue the SRO's ruling and the holding in *T.M.*, which held that there is "no uniform approach under IDEA when addressing matters such as a student's inattention and distractibility."  (DE 32-1 at 13.)  Furthermore, Defendant states that if an FBA or BIP is not developed to address the student's behavior, it may be addressed

elsewhere, such as in the IEP through behavioral strategies implemented in the classroom. (*Id.* at 13–14.)

The SRO correctly found that the District developed a 2016 FBA-BIP report, which was sufficient and, additionally, the May 2016 CSE had sufficient information regarding T.S.'s self-directed and inattentive behaviors, and adequately identified and recommended supports to meet T.S.'s behavioral needs.  Furthermore, many of the behaviors that the Parents allege impeded T.S.'s education, such as not maintaining eye contact or "tendency to wander off," do not appear sufficiently serious enough to warrant an FBA-BIP.  And even if these behaviors are serious, the record is replete with evidence to suggest that the District managed the behaviors in other ways, and nowhere is it alleged that these behaviors impeded the education of other students.

The Court agrees that the SRO thoroughly and carefully analyzed the appropriateness of the District's 2016 FBA-BIP report.  Even if a procedural violation occurred, it did not deny T.S. a FAPE.  The District's FBA-BIP was four pages and detailed T.S.'s "strengths, target behaviors, related setting events, assessments used to determine primary functions of behaviors and descriptions of such primary functions." (DE 32-1 at 13.)  Plaintiffs' argument that it did not address T.S.'s "inattentive behaviors and tendency to wander off," (DE 33-1 at 16), is unavailing because the SRO correctly found that the FBA-BIP identified T.S.'s problem behaviors of "prompt dependency, struggles to work independently, engages in self-directed activities, wanders," (DE 32-1 at 13).  Thus, the SRO did not err in holding that the FBA-BIP complied with federal and state law.

### iii. The SRO correctly held that the District gathered adequate evaluative data to draft appropriate IEPs

When developing an IEP, the CSE must review the most recent evaluative data to provide the student with "services narrowly tailored to his or her particular educational needs . . . so that

the developed IEP will reasonably enable the child to receive the educational benefits to which he or she is entitled by law." *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 110 (2d Cir. 2016). Although the burden is on the District to review the most recent evaluative data, there is no legal authority requiring the District to reach out and obtain information about privately obtained services. The Court acknowledges that, based on the record, the private services that the Parents obtained at Fit were akin to private tutoring services many District parents obtain for their children.

The District states that the only information provided to it regarding Fit was an email with a blurb about Fit and a couple of videos. (DE 32-1 at 19.) Also, the Fit director, Dr. Berens, participated at the November 2016 CSE meeting and agreed with the recommendation made by the CSE. (*Id.*) The CSE chairperson further asked whether there was anything to add for the CSE to consider, and neither the Fit director nor the Parents provided any behavioral data or reports to the CSE. (*Id.*)

The SRO found that the District had sufficient data to prepare the 2016–2017 and 2017–2018 IEPs. (DE 33-1 at 17.) However, Plaintiffs contend that the 2016 FBA-BIP report did not have appropriate evaluative data for the 2016–2017 IEP. (*Id.*) The record reflects that the District had extensive information and data relating to T.S.'s behaviors, including a four-page FBA-BIP, multiple reports, and evaluations. (DE 32-1 at 17.) The SRO conducted a detailed review of the information that was reviewed at the May 2016 CSE. (*Id.*)

For the 2016–2017 school year, the SRO found that the District timely held CSE meetings throughout the time period at issue and drafted IEPs that reflected the latest evaluative information with respect to T.S.'s needs and abilities. (*Id.* at 18.) The SRO further held that there is no indication that the CSE was refusing to consider information proffered by the Parents.

22

(*Id.*)  The record is devoid of evidence that the Parents ever requested ABA services, nor did they provide any further information regarding the services they obtained at Fit to the CSE.  The SRO further noted that the Parents never raised concerns to the CSE about the District's recommended programming, nor did they request that ABA or Fit be added to the IEP.  (*Id.*)

Plaintiffs point out that the SRO found there was data that ABA would be beneficial to T.S. but never included it in the IEP.  (DE 33-1 at 18–19.)  However, although Plaintiffs have established that ABA instruction would benefit T.S., they have not been able to firmly establish that such instruction is necessary to the Student's education, nor have they been able to show that the District's programming was not sufficient for T.S.'s education.  The SRO's finding stated that ignoring the information of ABA's benefit could have led to a pattern of indifference necessary to hold a denial of FAPE, but the SRO held otherwise, ruling instead that this issue did not lead to a cumulative procedural violation.  (*Id.* at 17.)

In support of their position, the Parents proffer testimony that T.S.'s special education teacher saw videos of T.S. participating in ABA instruction, and she acknowledged that she could not provide such instruction, and that she did not have any ABA training.  (*Id.* at 18.)  However, the District contends that the special education teacher merely testified that she understood the instruction methodology to be simple ABA methodology, but the fact that it was ABA instruction was never articulated by the Parents.  (DE 32-1 at 19–20.)

Plaintiffs state that the District neither requested nor considered the data from Fit in constructing T.S.'s IEPs, and the SRO placed the burden of providing data from Fit squarely on Parents.  (DE 33-1 at 19.)  Plaintiffs contend that it is the CSE's responsibility to gather relevant data, and the CSE never requested that data.  (*Id.*)  However, the SRO noted that because "the student did not begin attending Fit until June 2016, after the May 2016 CSE meeting, the district

members of the CSE could not have improperly failed to reach out to the student's providers or considered input offered by the parents regarding the student's experiences at Fit."  (DE 32-1 at 17–18.)

The CSE's May 2017 IEP included a February 2017 private auditory processing evaluation, which indicated that T.S.'s auditory comprehension was "significantly below average with ability to understand the spoken message in the 5th percentile."  (DE 33-1 at 19.)  Because the Parents forwarded the audiologist's report to the District after the annual review, and the CSE did not reconvene to review it, the 2017–2018 IEP was created without consideration of the audiologist's recommendations.  (*Id.*)  However, the District made repeated attempts to schedule a CSE meeting after the May 2017 meeting, and the Parents failed to cooperate.  (DE 32-1 at 21.)  The SRO noted that the "evidence post-dating the May 2017 meeting then weighs heavily against the parents' participation and predetermination claims."  (*Id.*)  The SRO noted that, after the May 2017 CSE meeting, additional CSE meetings were scheduled to review the February 2017 auditory processing evaluation; however, the Parents repeatedly cancelled the meetings and kept on postponing the meetings to a different day.  (*Id.*)

The evidence establishes that the District complied with all procedural requirements of the IDEA.  The District had sufficient evaluative data at the May 2016 and May 2017 CSE meetings, it developed an appropriate IEP, and it believed that the services being provided were sufficient and appropriate.  There was no need to consider additional ABA services when T.S. was making progress in the District's program.  Therefore, the Court concludes that the SRO correctly concluded that the District appropriately considered all available evaluative data, notwithstanding the fact that the District failed to seek out that data.

> **iv.    The SRO correctly held that the District did not predetermine the decision to deny support for ABA programming because its decision was thorough and well-reasoned**

Courts have found that the predetermination to not provide programming to a student can constitute the denial of a FAPE.  *See T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (citing *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 855–59 (6th Cir. 2004)). Predetermination effectively deprives the student's parents of meaningful participation in the IEP process.  *Deal*, 392 F.3d 840 at 857.

In the instant case, Plaintiffs allege that Defendant had a financial incentive to deny ABA instruction to T.S.  (DE 33-1 at 20–21.)  Furthermore, J.S. testified at the hearing that during kindergarten, T.S.'s special education teacher told her that T.S. needed services that the District could not provide and suggested seeking ABA instruction through private insurance.  (*Id.*) Plaintiffs suggest that the purpose of this advice was to secure financial relief for the school district.  (*Id.*)

The SRO found that "a fact finder could theoretically have concluded that the district's communications with the parents had convinced the student's mother that the district would, under no circumstances, provide the student with ABA on an IEP."  (DE 33-2 ¶ 38.)  Yet, the SRO deferred to IHO 2's finding that there was no predetermination.   (*Id.* ¶ 39.)  The Plaintiffs argue that the IHO 2 had not observed the demeanor of any of the District witnesses, other than one rebuttal witness, rendering his credibility determinations unworthy of deference.   (*Id.* ¶ 39.) However, Plaintiffs do not cite to any case law holding that lesser deference may be applied in such a case.

Plaintiffs' argument that the District predetermined the issue of ABA instruction is not convincing.  First, the record is devoid of any evidence that suggests the Parents ever requested

ABA instruction from the District.  And second, the District never denied such services due to cost considerations.  Although there is some evidence and testimony that the benefits of ABA instruction were known to the District, it never had the opportunity to consider ABA instruction for T.S.  The Parents never requested that the District provide ABA services as part of its IEP. The District was providing appropriate educational programming services, and T.S. was making meaningful progress, progress the Parents repeatedly noted.  Therefore, Defendant never refused services based on cost considerations, and there is no evidence to suggest that the District predetermined.  Even assuming that the teacher did make those comments, the offhand remarks of a teacher outside the context of a CSE meeting surely does not constitute a predetermination that the school district would not seek ABA instruction for T.S. if it were appropriate.  Thus, the SRO correctly held that the District did not predetermine the decision to deny support for ABA programming.

### B.    Plaintiffs are not entitled to relief under Section 504 and the ADA

The Court finds that, because the Plaintiffs failed to raise the ADA and 504 claims before the IHO and SRO, these claims must be dismissed for failure to exhaust administrative remedies. *See Fry*, 137 S. Ct. at 754.  The Plaintiffs contend that the ADA and Section 504's federal regulations do not require administrative due process exhaustion prior to suing in federal court. (DE 34 at 20–21.)  However, the Plaintiff's ADA and Section 504 claims of discrimination concern denial of an educational accommodation.  First, the Plaintiffs could not bring a similar claim against a public theater or library as only public schools are capable of providing such individualized education services.  *See Fry,* 137 S. Ct. at 757.  Second, an adult working at the school could not bring a similar grievance against the District because adult workers do not have

the same rights as a youth student to individualized education plans. Therefore, Plaintiffs were required to raise this issue during the IDEA administrative hearings.

Furthermore, the record does not support a finding that T.S. was denied a reasonable accommodation.  In fact, the record suggests that the District did everything within its purview to ensure that T.S. did not miss critical services provided by the school before his parents took him to Fit learning.  And, as previously stated, the Parents never expressed to the District that they were seeking a reasonable accommodation of ABA services for T.S.

In short, Plaintiffs are not entitled to relief under Section 504 and the ADA.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendant's motion.

**SO ORDERED**

Dated: Central Islip, New York
      March 8, 2022

/s/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge